ERNST A. MEYER AND CHARLES VEZETTI, PLAINTIFFS IN ERROR, v. LUIGIA MADREPERLA AND STEFANO MADREPERLA, DEFENDANTS IN ERROR.

Submitted July 8, 1902—Decided November 17, 1902.

1. Defendants, by writing, contracted to sell and convey to plaintiffs a tract of land, "free and clear," for $9,000, of which sum plaintiffs paid to defendants $500. Plaintiffs refused to accept the conveyance of the land tendered by the defendants, and brought this suit upon the contract, and therein claimed to recover the $500 paid, and further damages for a breach of the contract, limited,

however, to the reasonable expenses of an examination of the title. The action being at issue upon pertinent pleadings, it was brought to trial, and the facts made to appear in part by a stipulation of the parties and in part by witnesses called and examined. It thus appeared, without contradiction, that defendants made the contract in question; that plaintiffs refused the conveyance tendered, on the ground that it would not convey to them such title as they were bound to accept. *Held,* that to entitle plaintiffs to recover under the implied obligation inherent in such a contract that the vendor must make good title, or under the express obligation in this contract to sell and convey free and clear, plaintiffs were bound to establish that the conveyance tendered by defendants would not pass to them a good title.

2. Plaintiffs conceded that defendants had acquired and would have conveyed to them, by the conveyance tendered, a very large, though undivided, share of the land in question, but their contention was that one Patrick McDermott had some interest therein which would not have thus passed. Upon the uncontradicted facts, Patrick had no interest therein, unless he was living in 1890. He was, in 1879, a resident of New Jersey, and a common sailor. In September of that year he left the state and his place of residence, and had never been since heard from. *Held,* that, by the provisions of the act declaring when the death of persons absenting themselves shall be presumed, the conceded facts, in the absence of rebutting proof, established the presumption of the death of Patrick at the expiration of seven years, and afforded conclusive proof in the action of his death in the month of September, 1886, on some day not later than the last day of that month; that, upon the facts, plaintiffs had failed to make out the want of good title in defendants, and it was not erroneous to direct a verdict for defendants.

3. Whether a court of equity, upon application for specific performance of such a contract, would decline to make a decree upon the ground that the title tendered, though good upon the facts shown, was not a marketable title, was not considered, but—*Held,* that in an action at law for breach of such a contract, want of good title must be established, and the question whether the title is marketable is not involved.

On error to the Supreme Court.

For the plaintiffs in error, *Samuel A. Besson.*

For the defendants in error, *Charles L. Corbin.*

The opinion of the court was delivered by

MAGIE, CHANCELLOR. The return to the writ of error in this cause discloses an action on contract, in which, by various

counts, the plaintiffs seek relief for the breach of a contract, in writing, for the sale of land by defendants to them. The claim of damages for such a breach is limited to the return of the payment made by plaintiffs upon the contract and the expenses of examining the title to the land. By appropriate pleas defendants deny the breach of the contract, and the cause being put at issue thereon a verdict was rendered for the defendants.

The bill of exceptions discloses that the verdict for defendants was directed by the trial judge, to which direction exception was duly taken. The assignment of error upon that exception raises the only question which has been argued and presented for decision.

In reviewing the action of a trial court in controlling a verdict by a peremptory instruction, the question is whether, upon the testimony presented, a jury could find a contrary verdict, which, in the exercise of a sound legal discretion, must be supported by the court in which judgment is sought and upon which judgment must follow. *Crue* v. *Caldwell,* 23 *Vroom* 215; *Newark Passenger Railway Co.* v. *Block,* 26 *Id.* 605; *Meyers* v. *Birch,* 30 *Id.* 238; *American Saw Co.* v. *First National Bank,* 31 *Id.* 417; *Coyle* v. *Griffing Iron Co.,* 34 *Id.* 609; *Lippincott* v. *Royal Arcanum,* 35 *Id.* 309.

The review of a direction of a verdict for defendant involves, therefore, a consideration of what the plaintiff was required to prove to maintain the issue presented by the pleadings and what the proofs were.

To maintain the issue in this cause it is obvious that plaintiffs were required to prove that defendants made the contract on which the action was based; that defendants had broken the contract, and that the damage claimed, or some part thereof, had resulted.

The facts upon which the issue was tried and disposed of by the direction complained of were made to appear in part by a written stipulation of counsel and in part by the evidence of witnesses duly called and examined. There was no conflict or contradiction in respect to the facts.

It is conceded that it was thereby established that defend-

ants entered into a written contract to sell and convey, "free and clear," to plaintiffs the lands in question for the consideration of $9,000, of which sum $500 was paid by plaintiffs to defendants, and that the reasonable expense of a search of the title to said lands was $100.

As the existence of the contract thus sued upon was thus shown, and there was evidence as to the *quantum* of damages if defendants had broken it, the direction of a verdict for defendants can only be supported upon the ground that there was no proof of a breach of the contract sufficient to warrant the jury, if the case had been submitted to them, in finding for plaintiffs and sufficient to require such finding to be supported.

There was no contention that plaintiffs had rescinded or repudiated the contract because of actual or constructive fraud on the part of defendants. There were no facts shown that would have justified such contention. The sole contention was, and is, that defendants broke the contract by refusing to convey to plaintiffs such title to the lands in question as they had contracted to convey. The evidence contained in the bill of exceptions on this matter is rather meagre, but it is deemed to be sufficient to justify the inference that plaintiffs duly demanded of defendants a conveyance of the lands pursuant to the contract; that defendants duly tendered a conveyance thereof, and that plaintiffs refused to accept the conveyance tendered, on the ground that it did not convey such title to the lands as defendants had contracted to convey or as plaintiffs were bound to accept.

While it was, and is, conceded that the conveyance assumed to have been tendered by defendants would have passed to plaintiffs a very large, though undivided, share of said lands, the contention was, and is, that it did not convey the title of one Patrick McDermott to a small, undivided share thereof, or debar Patrick McDermott, if living, from claiming and enforcing his right thereto.

The contention on the part of defendants is that, upon the uncontroverted facts, no title in Patrick McDermott has been made out in proof.

The facts upon which these respective contentions are made must be briefly stated to enable our conclusions to be understood.

The land in question was formerly owned by John Mc-Dermott, who died testate, seized thereof, on October 26th, 1885. He had several children, all known to be then living, except a son named Patrick, who, in 1879, was unmarried and residing with his father in this state. He was a common sailor, and in September of that year left his residence here and went away and had never afterwards been heard from. By the will and codicil of John McDermott he bequeathed and devised his whole estate to trustees, upon certain specific trusts, which it is unnecessary to describe more particularly than to say that the trustees were to pay the income of various shares of the property to the respective known living children of testator for their lives, with a remainder over of each share. With respect to Patrick, the trustees were directed to pay him the income of one-tenth of testator's estate if he should, within five years after testator's death, return to claim it, with a provision that if he did not appear within that time the trustees were to assume that he was dead, and to divide the income between a daughter Mary and a son William, and after their deaths the one-tenth under that provision was to go, one-half to the brothers and sisters of Mary and one-half to the children of William, or, in default of children, to his brothers and sisters. By the codicil the provision for the ultimate disposition of that one-tenth was altered, so that, in case Patrick should not return to claim what had been devised and bequeathed to him within five years after testator's decease, it should be equally divided between testator's daughter Susan and his son William.

It further appeared that one of the parties interested, on January 20th, 1893, filed a bill in the Court of Chancery for the partition of the land in question, to which all the persons in interest were made parties, except Patrick, who, it was therein charged, had never appeared to claim his income within the five years succeeding his father's death, and had been absent and unheard from for over seven years, and there-

fore, under the statute, was presumed to be dead. The right
to partition was contested, but was determined in favor of
the complainant. *Roarty* v. *Smith, 8 Dick. Ch. Rep.* 253.
Such proceedings were thereupon had that, under a decree of
that court, a master made sale and conveyance of the land in
question to Stefano Madreperla, one of the defendants, who,
it is admitted, took title to the lands and went into and con-
tinued in possession.

Upon these facts it is entirely clear that Patrick took noth-
ing in the lands by descent from his father, for the latter
devised the whole thereof. It is equally clear that, under the
provisions of the will and codicil in which he is expressly
named, Patrick took no interest therein, because it is estab-
lished, by the admissions and proofs, that he did not appear
to claim the benefits thereby provided within the five years
after testator's death, and, upon that failure, the devise went
to the persons appointed to take the same in that event.

Upon an examination of the will and codicil, I think, how-
ever, that plaintiffs may raise the question which they pre-
sented below and now argue here.

Although Patrick took nothing by descent from his father,
or under the express provisions in his favor contained in his
father's will, yet, if he were, in fact, living at the death of
his brother Michael, he would have become entitled to a share
of the share in which Michael had a life interest. For, by the
provisions of the will, the trustees were directed to pay three-
twentieth parts of the net income of the estate to testator's son
Michael, and the testator therein devised and bequeathed three-
twentieths of his estate, after the death of Michael, to the child
or children of Michael, but, in case he should leave no child
or children surviving him, then to his brothers and sisters,
share and share alike, and, "in case any of them should be
dead leaving issue, such issue to take the deceased parent's
share." As Patrick, when he went away, was unmarried, his
*status* as a single person is presumed to have continued, no
contrary proof being adduced, and his presumptive death is
accompanied by the presumption that he left no lawful issue.
But if he were living at Michael's death, he would be one

of the brothers interested in the three-twentieths above mentioned. Under the provisions of the will, it is possible that Patrick, if living at the death of other of the beneficiaries, might be also interested in other shares, which were disposed of under similar provisions.

Michael died intestate and unmarried on October 26th, 1890. I think it may be assumed that he left no issue.

By the stipulation of the parties it is agreed that Patrick absented himself from this state and from the place of his last-known residence for the period of seven successive years, and that he has not been heard from since he left. These conceded facts make applicable the provisions of the act entitled "An act declaring when the death of persons absenting themselves shall be presumed," originally passed on March 7th, 1797, and continued, with various immaterial amendments, in force to the present time. *Gen. Stat., p.* 1185.

The presumption of the continuance of the life of a person shown to have been once living, in the absence of contradictory proof, seems not to have been limited, at common law, by any definite rule. But such a presumption was always assailable by evidence that the person had absented himself from his usual place of residence, and had not been heard from by those to whom his continued existence would naturally have been known. If evidence of absence unheard from for a period of seven successive years was adduced, it seems that the presumption of continued existence ceased, and that a presumption of death arose, which, in the absence of counter proof, would prevail. Whether the presumption of death, upon such proof, was one merely of fact, or a presumption of law, was made a question. 2 *Greenl. Ev.,* § 278; 1 *Tayl. Ev.,* § 220.

By the construction given by our courts to the Death act, above cited, I apprehend that it has been properly determined that proof of the absence of a person, whose existence is in question, from the state or from his last-known residence for the period of seven successive years defeats the presumption of continuance in life, and raises a counter presumption of death. This counter presumption of death is not a pre-

sumption of fact, but a presumption of law, which, in the absence of proof rebutting such presumption, stands as proof of death. The presumption raised by the statute, upon such proof, is not mere presumption of death, but is also a presumption fixing the time of death at the expiration of the seven successive years of absence unheard from. *Wambaugh* v. *Schenck, Penn.* 167; *Smith* v. *Smith,* 1 *Halst. Ch.* 484; *Osborn* v. *Allen,* 2 *Dutcher* 388; *Clarke* v. *Canfield,* 2 *McCart.* 119; *Hoyt* v. *Newbold,* 16 *Vroom* 219.

As the stipulation of the parties established the fact that Patrick had absented himself from the state and from his last-known place of residence in the month of September, 1879, and had not been since heard from, the presumption of the statute arose, and no rebutting evidence having been produced, such presumption was conclusive proof of Patrick's death in 1886, on some day of the month of September, not later than the last day of that month.

Upon these admissions it is apparent that plaintiffs had not shown that Patrick had any title to any share of the land in question, because it was also admitted that Michael and all others of the brothers and sisters of Patrick died after the year 1886.

But it is contended on the part of plaintiffs that, although the conceded facts required the conclusion that the title of defendants to the land in question was not shown to be defective in the respect complained of, yet that it was erroneous to direct a verdict for defendants, because, upon those facts, the title which plaintiffs would acquire by defendants' conveyance would be an unmarketable title, which would not be forced upon a purchaser under a bill for specific performance.

The unmarketable quality of the title is supposed to result from the fact that the death of Patrick in September, 1886, is established by statutory presumption, which would afford no protection to the purchaser if Patrick should hereafter appear to have been living. The statute which creates the presumption contains a proviso for the restoration of an estate recovered upon the presumptive proof of death to the person

who was evicted therefrom upon proof that he was, in fact, living.

In every contract for the sale of lands there is an implied agreement on the part of the vendor to make good title for the lands to the vendee. *Lounsberry* v. *Locander,* 10 *C. E. Gr.* 554. Failure to convey a good title will be a breach of the contract, and if vendor's title is, in fact, defective, an action will lie. An agreement to convey land "free and clear" is satisfied by a conveyance passing a good title.

When, upon bills for the enforcement of the performance of contracts for the sale of lands, the title to the lands was questioned, the Court of Chancery was originally accustomed to determine whether the title was good or bad, and to enforce the contract or dismiss the bill accordingly. But there grew up the practice of considering upon such bills, not merely the question whether the title was good or bad, but also whether it was free from reasonable doubt. This practice is said by Mr. Pomeroy to have originated under Sir Joseph Jekyll and Lord Thurlow, and the English reports abound in cases in which the Court of Chancery refused to require the purchaser to take a conveyance of the land if there was a reasonable doubt about the title, and it was always held that a reasonable doubt was disclosed if it was such as would affect the salability of the land if the purchaser should desire to sell it. *Pom. Spec. Perf.,* § 199; *Fry Spec. Perf., ch.* 17.

Mr. Pomeroy states the practice in such cases thus: "In suits by a vendor the purchaser will not be forced to complete the contract unless the title is free from reasonable doubt. This requirement should be carefully distinguished from the objection that, as a matter of fact established by the proofs, the vendor has no title at all, or has only a partial or defective one—an objection which, if well founded, will, as a matter of law, either totally defeat a specific performance or render its performance partial. * * * The rule now to be discussed differs in every respect from this. It assumes that the question whether the vendor's title is valid or imperfect is not definitely passed on by the court. If, however, there arises a reasonable doubt concerning the title, the court, with-

out deciding the question, regards its existence as a sufficient reason for not compelling the purchaser to carry out the agreement." *Pom. Spec. Perf.,* § 198.

This practice has, from the earliest times, been pursued in our Court of Chancery. Upon bills for specific performance of such contracts a bad title would afford a complete defence. An adjudication that the title was bad, upon such a contest, would probably settle the question as between the parties. But the court has, in its discretion, when there appeared debatable grounds for a doubt that could not be settled without litigation, or which would expose the purchaser to the hazard of litigation, declined to compel him to perform. Chancellor Runyon pointed out this distinction when he declared that there might be a good title at law which a court of equity would not force on an unwilling purchaser. *Vreeland* v. *Blauvelt,* 8 *C. E. Gr.* 483; *Dobbs* v. *Norcross,* 9 *Id.* 327; *Tillotson* v. *Gesner,* 6 *Stew. Eq.* 313; *Cornell* v. *Andrew,* 8 *Id.* 7; *S. C.,* 9 *Id.* 321; *Paulmier* v. *Howland,* 4 *Dick. Ch. Rep.* 364; *Lippincott* v. *Wikoff,* 9 *Id.* 107; *Day* v. *Kingsland,* 12 *Id.* 134.

Whether a bill by defendants praying that plaintiffs should be decreed to specifically perform this contract would have been dismissed upon the conceded facts of this case is open to question. The alleged flaw in the title consists in the possibility—it can hardly be called a probability—that Patrick may appear, or be shown to have been alive so as to have become interested in the share of Michael under the terms of the will. In respect to the doctrine that a purchaser will not be compelled to take a doubtful title, Lord Hardwicke observed that the "court must govern itself by a moral certainty, for it is impossible, in the nature of things, that there should be a mathematical certainty of a good title." *Lyddall* v. *Weston,* 2 *Atk.* 20. And Mr. Sugden declared that a purchaser would not be permitted to object to a title on account of a mere probability, "because a court of equity, in carrying agreements into execution, governs itself by a moral certainty; it being impossible, in the nature of things, there should be a mathematical certainty of a good title." *Sugd. Vend.* (1st

*ed.*) 214. In all deductions of title there are possibilities of error. A conveyance in the chain of title and necessary to its completeness, though appearing to be properly witnessed and acknowledged, and therefore capable of being proved by its production, or by its record under the statute, may afterward be shown to have been a forgery. A marriage essential to the descent of the land in the chain of title may afterward be shown to have been a meretricious union and its issue illegitimate. Proof that Patrick embarked in 1879 on a vessel, which was wrecked on a dangerous coast, and had not appeared or been heard of since that time, would raise a presumption of death without the statute, yet there would be a possibility that he escaped, and was yet alive. It may be well questioned whether any of such possibilities should deter a court of equity from enforcing the contract to purchase. Mr. Waterman, on a review of cases cited by him, declared that when the title rests on a presumption, and if the question were before a court of law, it would be the duty of the judge to direct the jury to find in favor of it, specific performance will be enforced. *Waterm. Spec. Perf.,* § 416.

Whether specific performance would have been decreed upon the facts disclosed in the bill of exceptions need not be decided. In actions at law the implied agreement for title in such a contract will be satisfied by a title good at law, upon the proofs under the rules of evidence. To recover at law for a breach of such a contract it must be shown that the title tendered was not a title good at law. The discretionary power of a court of equity with respect to a title which is doubtful, though good, is not within the province of a court of law, or a jury therein.

In states in which the jurisdiction of law and equity is mingled and administered by the same court the distinction in respect to relief in such cases has not been, and perhaps could not be, preserved. There are English cases indicating that the courts of law were at one time disposed to recognize the equitable doctrine in actions at law. In respect to those cases, Mr. Sugden remarks: "Whether courts of law were at liberty to follow in the footsteps of equity, and hold that a

title may be too doubtful to be forced on a purchaser, is a question on which eminent judges have differed with each other and even with themselves, but," he adds, "it appears to be ultimately settled that courts of law cannot adopt the equitable rule, and are bound to decide the legal question upon which the right to recover must depend." *Sugd. Vend.* (8th ed.), § 400.

The case upon which we must act involves the propriety of the direction of a verdict on uncontroverted facts which established, by the presumptions arising therefrom, that defendants had good title to the land plaintiffs had contracted to purchase. Whether the possibility that those presumptions might afterward appear to be erroneous would induce a court of equity, in its discretion, to deny specific performance or not, I think that the trial judge would have erred if he had submitted that question to the discretion of the jury. As the proofs made out a good title at law, the direction of a verdict for the defendants upon the issue made by the pleadings was proper.

The judgment must be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, VAN SYCKEL, FORT, GARRETSON, HENDRICKSON, PITNEY, BOGERT, ADAMS, VREDENBURGH, VOORHEES, VROOM. 12.

*For reversal*—None.